# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILLY RAY JOHNSON,<br><br>            Petitioner,<br><br>        v.<br><br>STUART SHERMAN,<br><br>            Respondent. | Case No. 1:21-cv-01313-DAD-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS<br><br>(ECF No. 8) |

Petitioner Billy Ray Johnson is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the first amended petition for writ of habeas corpus.

## I.

## BACKGROUND

On April 21, 2015, Petitioner was convicted by a jury in the Kern County Superior Court of twenty-four counts, including, *inter alia*, multiple counts of forcible rape, robbery, and burglary. The jury found true various special allegations regarding firearms. (8 CT[1] 1868–1944.) Petitioner was sentenced to multiple life, or life-equivalent, terms. (8 CT 2055.) On July 11, 2019, the California Court of Appeal, Fifth Appellate District "remand[ed] for the trial court to exercise its discretion to consider striking any firearm enhancements imposed pursuant to Penal

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on October 25, 2021. (ECF No. 13.)

1   Code sections 12022.5, subdivision (c) or 12022.53, subdivision (h), as amended by Senate Bill

2   No. 620 (Stats. 2017, ch. 682, §§ 1, 2, eff. Jan. 1, 2018)," but affirmed the judgment "[i]n all

3   other respects." People v. Johnson, No. F071640, 2019 WL 3025299, at *16 (Cal. Ct. App. July

4   11, 2019). On August 6, 2019, the Fifth Appellate District denied the petition for rehearing. (LD[2]

5   81.) On October 23, 2019, the California Supreme Court denied Petitioner's petition for review.

6   (LD 82.)

7         Upon remand, the trial court held a hearing, exercised its discretion to not strike the

8   firearm enhancements, and affirmed Petitioner's prior sentence. On May 21, 2021, the California

9   Court of Appeal, Fifth Appellate District affirmed. People v. Johnson, No. F080848, 2021 WL

10   2023582 (Cal. Ct. App. May 21, 2021).

11         Petitioner then filed a federal habeas petition. (ECF No. 1.) As the petition was not signed

12   under penalty of perjury, the Court granted Petitioner leave to file an amended petition. (ECF

13   No. 4.) Petitioner filed a first amended petition ("FAP") raising the following claims for relief:

14   (1) the trial court's denial of Petitioner's request to access the source code utilized to run the

15   software that analyzed the DNA evidence violated his rights to confrontation, compulsory

16   process, and due process; (2) the trial court's exclusion of Petitioner's proffered expert testimony

17   violated his rights to confrontation, compulsory process, and due process; (3) the trial court's

18   failure to grant a mistrial after discharge of a juror violated Petitioner's statutory and Fifth and

19   Sixth Amendment rights; and (4) the trial court erroneously denied Petitioner's Batson/Wheeler

20   motion. (ECF No. 8.) Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 16,

21   23.)

22   **II.**

23   **STATEMENT OF FACTS[3]**

24       This case revolves around four burglaries and sexual assaults that occurred
between late June and late August 2013.[4] Appellant was ultimately charged and

25   convicted with perpetrating all four attacks and appeals from those convictions.

26   Given the variety of issues raised by appellant, we will first generally recount the

27   [2] "LD" refers to the documents lodged by Respondent on October 25, 2021. (ECF Nos. 13–15.)
[3] The Court relies on the California Court of Appeal's July 11, 2019 opinion for this summary of the facts of the
crime and the procedural history of the case. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

28   [4] Subsequent references to dates are to dates in the year 2013, unless otherwise stated.

events, including relevant evidence from the trial, before generally recounting relevant aspects of how the trial unfolded. Additional factual detail will be provided as each relevant legal issue is discussed.

### *The Assaults*

The first incident occurred in the early morning on July 1, and involved two young women. According to one of the women, she went to bed around 2:00 a.m. and woke up to find a man standing near a window in her room. She described the man as around six feet tall, and black with hazel brown eyes. He was wearing a ski mask, a dark sweatshirt, and gloves with the fingers cut off. He possessed a black gun.

The man told the woman to look away and cover her eyes; he placed a pillow case over her head and told her he would kill the girl in the other room if she was not quiet. The man removed the woman's bra and told her he was going to rape her. He then put the gun to the woman's head and cocked it.

At this point the woman grabbed for the gun and yelled out. The man responded by hitting the woman in the head several times. The second woman heard the yelling and came toward the room from where she had been sleeping. The man struck her with the gun and slammed her against the wall, telling her to shut up or he would kill her. During this time, the first woman ran from the apartment. The man gave chase. The second woman locked the door and tried to call 911. The first woman ultimately reached her cousin's apartment, where the police were called. Upon returning to the apartment, the first woman noticed her cell phone was missing.

The police determined the man likely entered the apartment through a bedroom window and found the screen had been removed from a window that was found open. They located a single shoe print at the scene. A black and white pair of Nike shoes later recovered from appellant's residence could not be excluded as a match, although there were insufficient distinguishing features to identify them as the shoes that left the print.

The women first called 911 at 3:29 a.m., and the police estimated the crime occurred about 15 minutes before the call. Analysis of appellant's cell phone records showed he was speaking with his girlfriend until 3:00 a.m., stopped using the phone for a while, then resumed texting his girlfriend at 4:00 a.m. His phone was utilizing cell towers that covered both his residence and the scene of the crime. Apparently, no DNA from this crime was obtained and tested.

The second incident occurred on July 18, around 5:00 a.m. The woman attacked in this incident said her husband left for work around 4:45 a.m. She fell back asleep after he left, only to wake up with a gloved hand over her mouth. Her attacker was a black male slightly taller than 5 feet 11 inches with a deep voice who smelled like cigarettes. He wore a black ski mask, black jean shorts, a sweater, black shoes with white markings, and had a black backpack.

The man instructed the woman to go to the living room and get on her knees. He covered her head with a blanket. He told her not to look at him, not to scream, and to think of her daughter. He used a purse strap to tie her hands. The man then asked for money and began searching the apartment. He told the woman he knew her, called her by name, and said he'd been watching her. He removed her clothing and touched her breasts and body. The man then had intercourse with the

woman, using a condom. After he finished, he took the woman to the bathroom and washed her.

The man took the woman back to the living room, her face covered with her shirt, and sat down next to her. He asked her about her relationship and whether she would tell her husband what had happened, and told her not to call the police. He stated he would take her cell phone, but told her he would hide it instead when the woman said there were special pictures of her daughter on the phone. Eventually, the man left through the kitchen window, and around 6:00 a.m., the woman called 911.

The police investigation found a window screen on the ground and that the bathroom window could be opened from the outside, even if locked. The rag used to wash the woman could not be found, but an unknown phone cord, the purse strap used to bind the woman, and the woman's cell phone along with other items were all collected and analyzed. The police also found shoe tracks in the dirt behind the woman's apartment. These prints were consistent in tread to a pair of black Reebok shoes found at appellant's residence.

The review of appellant's cell phone usage showed activity up to about 1:15 a.m. the morning of the attack and then a break until 5:57 a.m., when appellant began calling his girlfriend. The activity around 1:00 a.m. occurred near appellant's residence. The call at 5:57 a.m., however, utilized the cell tower covering the victim's apartment. In activity after that time, appellant's cell phone travelled back to the cell tower covering his apartment, arriving there by 6:17 a.m. Police reviewed four months of cell phone records and found this was the only time in that period appellant's cell phone connected with the tower covering the woman's apartment.

The police also attempted to conduct DNA analyses on several samples including the purse strap, telephone cord, and cell phone collected, along with a sample taken from the kitchen window. These samples all had multiple contributors and either could not be manually interpreted or could not be matched to a known potential contributor. The police, therefore, utilized a software program called TrueAllele to obtain what are known as match statistics for each sample. These statistics determine the probability that a known DNA profile is a contributor to the mixture when compared to a random person from various ethnic populations. The software is based on known mathematical models based on an algorithmic concept known as the Markov chain Monte Carlo, but the actual analysis it conducts is not publicly known and its source code is not made available for review. Its results have been subjected to peer review analysis and its program validated in certain controlled studies.

Two experts tested the DNA used in appellant's case. The first was Dr. Mark Perlin, the inventor of TrueAllele and a hired expert in the case. The second was Garett Sugimoto, a criminalist trained to use the TrueAllele software with the Kern Regional Crime Laboratory. Both sets of results were presented at trial.

According to Dr. Perlin, a match between appellant and one of the contributors in the sample was 43 times more probable than coincident for the purse strap, 34,000 times more probable for the telephone cord, 41,000 times more probable for the cellphone, and 10 times more probable for the kitchen window. In comparison, when looking at whether the woman was a contributor on the purse strap, the results were five quintillion times more probable than coincident. Of all the

samples from this incident, Dr. Perlin found three supported appellant as a contributor, nine supported exclusion, and one was inconclusive.

Sugimoto utilized a slightly different methodology. If the match statistic generated was greater than 10,000, he classified the result as "cannot exclude." If the result was between negative 10,000 and positive 10,000, he classified the result as "inconclusive." If the score was less than negative 10,000, he classified it as "an exclusion." According to Sugimoto, appellant could not be excluded as a contributor to the telephone cord and cellphone samples. In these examples, appellant's score was between 39,000 times and 79,000 times more probable than coincident, depending on the ethnic group considered, for the telephone cord, and between 12,000 times and 22,000 times more probable for the cellphone sample. Sugimoto found the purse strap and kitchen window samples inconclusive. Appellant was excluded from the other samples reviewed.

The third incident, involving a woman and her children, occurred on August 1. One early morning prior to the event, the woman's children saw a light shining through the window and someone attempting to open the window. In response, the family put wooden dowels in all the window tracks. Two days before the assault, the woman found all the dowels removed and around $150 missing. The apartment manager responded by placing screw-type locking devices on the window tracks.

The morning of the attack, the woman got up for work at 4:00 a.m. When she opened the front door to leave, a tall black man smelling of cigarettes pushed her back into the apartment. He was wearing dark blue gloves, a black mask, a black sweater with a hood, red athletic shoes, and had a black backpack.

The man used tape from his backpack to cover her eyes and mouth. He used plastic ties to bind her hands and feet and placed a rag in her mouth. At one point during the assault, the woman told him she was pregnant. The man responded by kicking her in the back before placing a pillow under her head and stomach. After moving her several times, the man eventually ripped the woman's bra off and rubbed her breasts before removing her pants and engaging in intercourse. He told the woman not to resist or something would happen to her children. After he ejaculated, the man used a wet towel to clean the woman.

The man also attacked the children in the home. Two of the young girls were taken into the room with the woman, having been stripped naked. A third was brought to the room with the woman but remained clothed. The man used plastic ties to bind the children as well, and placed clothing in their mouths. He touched the naked breasts of one of the children. During the time he was assaulting the children, the woman heard the man turn on the shower.

When he finished the assaults, the man placed all four people on a bed, removed their bindings with a knife, and told them not to look at him. He collected and took those bindings with him along with the towel used to clean up. He then covered them with a blanket and said he was sorry for what had happened. He told the woman not to call the police or her children would pay for it, took her cell phone, and left. The woman immediately dressed, ran to a neighbor's apartment, and called the police.

The 911 call was received at 6:03 a.m., and the police estimated the crime occurred about 40 minutes earlier. A review of appellant's phone records showed no activity from 8:30 p.m. on July 31, until 4:27 a.m. on August 1, when appellant

received a text message from his girlfriend. Appellant responded at 5:25 a.m., and called her several times until around 7:06 a.m. The cell phone utilized a tower that covered both appellant's residence and the woman's apartment at all times. The next day, appellant began reviewing web pages discussing the recent attacks.

DNA samples were again collected from the crime scene. None of these samples resulted in a manual analysis match to appellant, but three showed potential matches through the TrueAllele program. Dr. Perlin found two stains on the woman's pants that showed appellant was 1.78 million times and 5.44 million times more likely than coincident to be the contributor. A stain on the woman's shirt resulted in a 740 million times more likely than coincident finding. In comparison, the woman's boyfriend's DNA was also found in these samples at respective probabilities of 25, 263, and 272 quadrillion times more likely than coincident. A further nine results reviewed by Dr. Perlin presented results that excluded appellant as a donor. Sugimoto's analysis of the three samples implicating appellant showed results between 2.3 and 12 million, 426,000 and 2.1 million, and 43 and 100 million times more likely than coincident, respectively.

The fourth incident, involving a woman and her daughter, occurred on August 19. The woman involved went to bed around 11:30 p.m. on August 18, and awoke to a man in a black hooded sweater and a black mask holding a gun. She could not see his skin. She thought from his voice that he was black, and, at one point, he asked what race she thought he was. She testified she responded "Hispanic," to which the man said, "yeah right, like I would be." Her daughter got a better view of the attacker and said he was a black man wearing black gloves, khaki shorts, a puffy snow jacket over an orange shirt, and red shoes with green on them.

The man placed tape over the woman's eyes and around her head. He bound her hands behind her back with zip ties. He later did the same to the woman's daughter. He asked for money and the woman told him about $5,000 cash in the apartment that the man ultimately took. The man asked about phones in the house and took the woman's cell phone.

The man again sexually assaulted the woman involved. He removed her tank top with a knife. He then removed her pants and made her lay on a towel. He kissed her breasts and touched her genitals. He used a condom when he had intercourse with her. When he was done, he took the woman to the bathroom, put her in a tub of water, and cleaned her.

During this time, the daughter freed herself and found a phone the man had not known about. She called 911. When the man saw her, she threw down the phone and fled the apartment. The man fled around this time, apparently taking the towel. When he did, the woman called 911 as well. The first call to 911 occurred at 3:43 a.m.

The police obtained several items of evidence from the apartment, including an ice chest, multiple zip ties, duct tape, and shoe prints. They attempted to analyze finger prints found on the cooler but obtained no matches. They ultimately found the cell phone in a field near the apartments. A red pair of Nike shoes obtained from appellant's apartment contained a tread deemed similar to a shoe print found on the kitchen counter in the apartment.

Unlike the other crimes, there was no cell phone data to review because appellant's pre-paid phone had been disconnected for non-payment on August 14. On August 19, at 4:06 p.m., appellant's phone was reconnected after a payment

was made. Appellant's internet search history showed he searched for articles about the recent assaults on August 20, 22, 23, 24, and 31, as well as September 1.

The police later determined that appellant's girlfriend bought a used 1994 Chevrolet Caprice at 11:10 a.m. on August 19, and paid $2,250 in cash. She also posted a message a few days later on Facebook suggesting a participant in the conversation was not a "true criminal like Billy." Appellant responded to this message, saying "yeah, but when da money come in, what you be saying? Can you buy me a new car? Yeah."

DNA evidence was collected from several items. One of these was a zip tie found on the roadway near the apartment. The DNA on this item was sufficient for a manual interpretation and could be utilized in a CODIS search. This search resulted in a CODIS hit for the DNA. A reference sample from appellant was then requested and Sugimoto determined the DNA from this sample was consistent with DNA on the zip tie. Appellant's own expert also conducted a manual review of the DNA from the zip tie and concluded "that Mr. Johnson was present" as the major contributor to that sample.[5]

Samples were also run through the TrueAllele software. Dr. Perlin found two results included appellant as a contributor, while 10 results excluded appellant. The two inclusive results were from DNA on the bathtub handle, which showed results of 550 times more likely than coincident, and on the zip tie found on the road, with results of 211 quintillion times more likely than coincident. Sugimoto found the bathtub handle DNA inconclusive but the zip-tie DNA inclusive, with a range of 170 quintillion to 15 sextillion times more likely than coincident.

***Appellant's Arrest and Subsequent Conduct***

On August 28, appellant was found sitting in the driver seat of a running 1994 Chevrolet Caprice. He was arrested for driving on a suspended license, and police found brass knuckles and two condoms when searching the car. Appellant said he had bought the car with cash earlier and the brass knuckles were inside at the time. Appellant said he and his girlfriend were not working but had been able to save for the car. As he was being transported to jail, the arresting officer reported that appellant spontaneously stated, "I told you that this had to do with more than just brass knuckles" and "I have too many girls to be out here raping people." The arresting officer described appellant as 6 feet 1 inch tall, and 190 pounds. He said appellant smelled of stale cigarettes and as if he had not showered in days.

Following his arrest, appellant was placed under police surveillance. On October 13, he was spotted outside at 2:40 a.m. and again around 3:45 a.m., wearing a black hooded sweatshirt with the hood up and dark pants. The police placed high-beam headlights on appellant and he raised his hands and yelled. They then lost sight of him until he returned home at 6:54 a.m. A later search of appellant's phone recovered several videos from that morning, recorded between about 2:00 a.m. and about 6:00 a.m. These included a video showing someone searching next to a doormat and plant at the apartment of a woman named Teresa, and a video recording a different naked woman taken though her bedroom window.

On October 14, police saw appellant enter the passenger side of a maroon Chevrolet Caprice driven by his girlfriend shortly after and near where officers

---

[5] Appellant's expert also found she could not exclude appellant as a minor contributor to sperm cell fractions on shirt and pant stains from one of the other attacks.

allege a black male fired several shots in front of an apartment complex. Police tailed the Caprice and saw an object thrown from the passenger side window. The car was stopped, and appellant was arrested. His girlfriend was released. Appellant later called his girlfriend from the jail and gave what police believed was a coded message to go retrieve the gun used in the shooting. Police returned to where they believed the gun had been tossed and found appellant's girlfriend there. They detained her, searched the area, and found a gun that was later determined to be involved in the shooting.

Subsequent searches of appellant's residence separately located a black ski mask and a black hooded pullover sweatshirt kept in a plastic trash bag in appellant's backyard, along with several items of clothing similar to those described by the victims, and a group of white zip ties in appellant's residence. Police also learned that appellant was conversing with a 14-year-old girl on Facebook in April and September. In those conversations he told the girl he found her "hella sexy" and wondered why "[e]veryone trips on age" when she did not want to speak with him because he was a grown man. In October appellant also attempted to friend a 15-year-old girl.

Appellant was arrested and eventually charged with committing the above assaults.

### *Jury Selection*

Two issues relevant to this appeal arose during the jury selection process. First, appellant's counsel noticed that the prosecutor had utilized six of their first seven peremptory challenges on female prospective jurors. When the sixth prospective female juror, K.G., was struck, appellant's counsel made a *Batson/Wheeler*[6] objection. The trial court overruled this objection quickly, noting objective reasons why the prospective juror could be excluded, including her age and lack of sleep. The prosecutor agreed and further pointed to her unique hair color and multiple piercings.

The prosecutor's next challenge was also to a female prospective juror, L.W. Appellant's counsel objected, renewing its *Batson/Wheeler* objection based on the fact seven of nine objections were to women. The court determined a prima facie showing had been made and asked the prosecutor for an explanation. The prosecutor recounted a prior conversation with the prospective juror where she claimed her neighbor had called the police on her after peeking through her windows and seeing her dog going to the bathroom on the rug. The prosecutor also found it odd the prospective juror was more upset about this incident than the death of her son and had apparently gone to law school for a year because she had become interested in the law while serving as president of a teacher's association. The prosecutor thought this prospective juror might have mental deficiencies.

Appellant's counsel requested explanations for all other female prospective jurors dismissed as well, claiming the objection made was to all of them. The prosecutor argued such an explanation was not required. The court noted its prima facie finding related only to the most recent dismissal and found the prosecutor's explanation as to that prospective juror sufficient to show she was not dismissed for being a woman. It therefore did not require the prosecutor to provide any

---

[6] A *Batson/Wheeler* motion takes its name from two cases, *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).

further explanations. The court also noted at the time that four men and seven women were in the jury box.

Jury selection continued, and 12 jurors were selected. The court swore in those jurors, then took a break for the day before continuing on to select alternates. During this break, one of the jurors learned his wife had been diagnosed with cancer and would undergo surgery in two days. The next morning, the court inquired into the juror's discovery and ultimately determined that the juror should be excused for cause. During these proceedings, the parties debated on how to proceed.

The prosecutor argued the court should wait to dismiss the juror until after the alternates were sworn, then replace the juror with an alternate. The defense stated it was willing to stipulate to reopening voir dire, but only if the court provided the defense with its full 20 peremptory challenges, rather than the two it had not previously exercised. An alternative, the defense argued, was granting a mistrial and beginning jury selection again. The court, instead, dismissed the juror, denied a defense motion for a mistrial, and proceeded to the selection of alternates. When this was complete, the court placed one of those alternates on the jury and proceeded to trial.

***Appellant's Trial and Conviction***

One of appellant's goals for trial was to challenge the TrueAllele DNA results. As part of his attempt to do so, appellant made a pretrial request, and renewed that request at trial, for the source code to the TrueAllele program. The People opposed this request, arguing the code was subject to the trade secret privilege contained in Evidence Code section 1060, and appellant had not made a proper showing for production. They submitted a declaration from Dr. Perlin supporting this claim.

The trial court held an in limine hearing on the request. Appellant's counsel argued the source code was the only means to determine whether the programmed mathematical formulas were working properly and noted there were discrepancies between the results obtained when Dr. Perlin utilized the software and when Sugimoto ran the same tests. Appellant's counsel further agreed to sign a protective order to view the code. Counsel did not, though, submit a declaration from their expert supporting a need for the requested evidence.

The trial court ultimately ruled there was "no declaration or showing, with any precision or particularity, how a review of the TrueAllele source code would enable the defense to determine what assumptions were made or how reviewing the highly technical code would help defense counsel in cross-examining Dr. Perlin ...." The court summarized its position by saying it did not "see a specific logical connection between the source code to be examined and some consequential fact" before recounting the various ways the TrueAllele software has been validated previously, used in prior cases, and peer reviewed.

During trial, appellant raised his request again when objecting to testimony by Dr. Perlin that the TrueAllele software objectively inferred genotypes. The trial court again found no particularized showing warranting disclosure and denied the request.

Appellant also sought to attack the TrueAllele results through expert testimony and called Suzanna Ryan to testify regarding her review of the DNA analysis. The

People objected to portions of Ryan's testimony concerning how TrueAllele works. They argued she lacked foundation to provide such testimony, given that she had neither used nor been trained on the software. The trial court agreed, explaining it would only allow Ryan to testify regarding "the methodology that she has employed in the past ... within the confines of what tests she's actually run" and not how TrueAllele results could be different based on changed settings. The court sustained several prosecutorial objections to questions posed to Ryan on these or similar grounds.

Johnson, 2019 WL 3025299, at *1–8.

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

>      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been

1  "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

2  576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is

3  reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

4        In ascertaining what is "clearly established Federal law," this Court must look to the

5  "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

6  relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

7  decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that

8  'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent

9  decisions"; otherwise, there is no clearly established Federal law for purposes of review under

10 AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,

11 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125,

12 123 (2008)).

13       If the Court determines there is clearly established Federal law governing the issue, the

14 Court then must consider whether the state court's decision was "contrary to, or involved an

15 unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A

16 state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at

17 a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

18 court decides a case differently than [the Supreme Court] has on a set of materially

19 indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an

20 unreasonable application of[] clearly established Federal law" if "there is no possibility

21 fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

22 Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

23 court's ruling on the claim being presented in federal court was so lacking in justification that

24 there was an error well understood and comprehended in existing law beyond any possibility for

25 fairminded disagreement." Id. at 103.

26       If the Court determines that the state court decision was "contrary to, or involved an

27 unreasonable application of, clearly established Federal law," and the error is not structural,

28 habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

1   injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

2   (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

3   (1946)).

4     AEDPA requires considerable deference to the state courts. Generally, federal courts

5   "look through" unexplained decisions and review "the last related state-court decision that does

6   provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

7   adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption

8   may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on

9   different grounds than the lower state court's decision, such as alternative grounds for affirmance

10   that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

11     "When a federal claim has been presented to a state court[,] the state court has denied

12   relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

13   the state court adjudicated the claim on the merits in the absence of any indication or state-law

14   procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a

15   decision on the merits and there is no reasoned lower-court opinion, a federal court

16   independently reviews the record to determine whether habeas corpus relief is available under

17   § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

18   record is not de novo review of the constitutional issue, but rather, the only method by which we

19   can determine whether a silent state court decision is objectively unreasonable." Himes v.

20   Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

21   record and "must determine what arguments or theories . . . could have supported, the state

22   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

23   those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

24   Court." Richter, 562 U.S. at 102.

25   ///

26   ///

27   ///

28   ///

**IV.**

**DISCUSSION**

**A.  Access to Source Code**

In his first claim for relief, Petitioner asserts that the trial court's denial of Petitioner's request to access the source code utilized to run the software that analyzed the DNA evidence violated his Sixth Amendment right to confrontation and compulsory process and his Fourteenth Amendment rights to present a defense and to a fair trial. (ECF No. 8 at 4, 11–22.)[7] Respondent argues that rejecting Petitioner's DNA challenges was reasonable and that a novel claim must fail under AEDPA review. (ECF No. 16 at 8.) This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LD 82.) As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim regarding access to the source code, the California Court of Appeal stated:

> Both prior to and during trial, appellant moved for or requested discovery related to the DNA analyses using software developed by TrueAllele supporting the case against him. Specifically, appellant requested access to the source code utilized to run the software. The trial court rejected these requests on the ground the source code was a trade secret under Evidence Code section 1060, and that appellant had not made a prima facie showing the code was relevant or necessary to his defense. On appeal, appellant contends these rulings violated his Fifth, Sixth, and Fourteenth Amendment rights. The People respond through several arguments including that appellant was not entitled to pretrial production and that he failed to meet his burden for obtaining the evidence at trial. The People further contend appellant had no Sixth Amendment pretrial right to obtain the evidence, and that the routine application of evidentiary laws does not implicate appellant's constitutional rights. Finally, the People argue any error was harmless.

> ***Standard of Review and Applicable Law***

> "Evidence Code section 1060 provides that an owner of a trade secret has a privilege to refuse to disclose the secret. Evidence Code section 1061, subdivision (b)(1) requires that a party in a criminal action seeking a protective order submit an affidavit based on personal knowledge listing the affiant's qualifications to

---

[7] Page numbers refer to the ECF page numbers stamped at the top of the page.

give an opinion, identifying the alleged trade secret, identifying the documents disclosing the trade secret, and presenting evidence that the secret qualifies as a trade secret." (*Stadish v. Superior Court* (1999) 71 Cal.App.4th 1130, 1144–1145, italics omitted.) The statutory scheme has been interpreted such that "the party claiming the privilege has the burden of establishing its existence. [Citations.] Thereafter, the party seeking discovery must make a prima facie, particularized showing that the information sought is relevant and necessary to the proof of, or defense against, a material element of one or more causes of action presented in the case, and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit. It is then up to the holder of the privilege to demonstrate any claimed disadvantages of a protective order. Either party may propose or oppose less intrusive alternatives to disclosure of the trade secret, but the burden is upon the trade secret claimant to demonstrate that an alternative to disclosure will not be unduly burdensome to the opposing side and that it will maintain the same fair balance in the litigation that would have been achieved by disclosure." (*Bridgestone/Firestone, Inc. v. Superior Court* (1992) 7 Cal.App.4th 1384, 1393.)

"The court's ruling on a discovery motion is subject to review for abuse of discretion." (*People v. Jenkins* (2000) 22 Cal.4th 900, 953.) "A trial court has abused its discretion in determining the applicability of a privilege when it utilizes the wrong legal standards to resolve the particular issue presented." (*Seahaus La Jolla Owners Assn. v. Superior Court* (2014) 224 Cal.App.4th 754, 766.)

Errors of both statutory and constitutional magnitude are generally subject to a harmless error analysis. Constitutional errors are generally subject to the federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24, asking " ' "whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 873, overruled on other grounds by *People v. Hardy* (2018) 5 Cal.5th 56, 104.) Where the right to effective cross-examination is at issue the analysis is "based on factors such as: 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*People v. Sully* (1991) 53 Cal.3d 1195, 1220.) Statutory errors, including the denial of a defendant's motion to compel discovery, are generally subject to the state harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, asking whether "it is reasonably probable that the error affected the trial result." (*People v. Elder* (2017) 11 Cal.App.5th 123, 133.)

### *Any Error was Harmless Beyond a Reasonable Doubt*

The briefs in this case argue the issues surrounding the trial court's decision not to grant appellant access to the TrueAllele source code from contrasting positions. Appellant and the amicus briefs focus heavily on the constitutional protections they contend require production of source code for machine derived testimony that utilizes human-programed mathematical operations that cannot be independently verified exclusive of the programming. They rightly express serious concern that convictions utilizing such results without production of the source code could result in convictions based on "black box" judgments and point out that appellant made a particularized showing that running the same evidence through the software two times, in two different locations, yielded different results, some of which were helpful to the defense. They argue this was a

satisfactory showing to warrant production given the high probability the source code contained errors. The People argue that this case turns on the mere application of evidentiary law and that such routine rulings do not even implicate constitutional protections. Further, the People argue the record supports the trial court's finding that the predicate showings for the production of trade secret protected evidence were not met. The People conclude by arguing any error was harmless.

We recognize that appellant made a strong showing that the software produced arguably inconsistent results and acknowledge that in such situations the software is the most likely source of clarification for such issues. However, we do not reach whether the trial court erred in rejecting either of appellant's requests for production because we readily conclude the evidence overwhelmingly confirms appellant's guilt and, thus, any error was harmless, even under the elevated federal analysis.

In this case, the prosecution built a strong circumstantial case that the four incidents involving break-ins, robberies, assault, or rapes were committed by the same individual. The attacker was consistently described as a black male with a deep voice and hazel eyes. In three of the four incidents, the attacker was described as smelling dirty or of cigarettes. The attacker consistently wore a black hooded sweatshirt and ski mask. In several incidents, the attacker carried a black backpack.

A similar modus operandi, including increasing efforts to avoid detection, was also shown across the attacks. Each occurred in the early morning hours and appeared to be committed by someone that preferred to enter through windows. In the first, second, and fourth incidents, the women awoke to a man in their room and, in two instances, awoke to him covering their mouths. In the first and fourth incidents, the attacker possessed a gun. In the second and fourth incidents, the attacker obtained a knife and used that knife to remove the victims' clothing or bindings. In all four incidents, the attacker covered the victims' head or eyes. The attacker used available items in the home, or duct tape and zip ties brought for the attack, to bind the victims. The attacker engaged in touching and fondling activities before sexual activity and utilized a condom or towels to reduce or eliminate evidence. The attacker regularly cleaned the victims after engaging in sexual contact and collected the items used to bind the victims when leaving. The attacker spoke with several of the victims in conversational ways about his sexual desire, need for money, or actions. In all four incidents, the attacker took or hid the victims' cellular phone after the attack.

The prosecution further built a strong circumstantial case, exclusive of DNA evidence, that appellant was the attacker in one or more of the incidents. In the first incident, a shoe print could not be ruled out as coming from a shoe belonging to appellant and his cellular phone records suggested he was near the attack when it occurred. In the second incident, appellant was described as wearing black shoes and the tread from black Reebok shoes found at appellant's residence appeared to match tread marks found at the crime scene. Moreover, appellant's cell phone accessed the cellular tower covering the area of the crime scene only once in the four months of phone records reviewed, a time roughly one hour after the attack. For the third incident, appellant's cell phone was in the area of the attack, although the tower also covered appellant's home. In the fourth incident, the attacker was described as wearing red shoes and the tread from red Nike shoes recovered at appellant's residence appeared similar to tread marks found at the crime scene. In that incident, $5,000 in cash was stolen. Shortly after the theft,

appellant's girlfriend bought a $2,250 car with cash and appellant posted a response to a social media comment about his status as a criminal that said, "yeah, but when da money come in, what you be saying? Can you buy me a new car? Yeah."

While the case made by the People was circumstantial, it was not, as appellant argues, so weak that "it is doubtful that the prosecution had legally sufficient evidence to support its case against appellant" without the TrueAllele evidence. The prosecution presented a confluence of circumstances, each unique if not particularly strong but compelling in combination, showing both that the crimes were committed by one person and that appellant committed one or more of the crimes. Thus, where there were three different shoe prints at three different crime scenes, and witnesses had described the shoes in two of those incidents, appellant was found to have multiple pairs of shoes that both matched the description provided by the witnesses and/or could not be ruled out as causing the print for each incident. Similarly, in three of the four incidents, appellant was using his phone before and after, but not during the attack, in locations that utilized cell towers covering the crime scenes and, in one situation, this was the only time appellant's phone was in that area over a several month period. Added to these circumstances were appellant's access to cash immediately after one of the robberies, his statements to police suggesting guilt, his search history for information on the attacks, his admissions to other robberies, his possession of clothing and tools such as the zip ties similar to those used in the attacks, and his cell phone videos demonstrating sexually driven prowling behaviors. Simply put, if this case had been tried prior to the advent of DNA evidence, or without the DNA component, we see little if any basis for an appeal on the state of the evidence. The circumstantial evidence of guilt was simply overwhelming.[8]

Appellant was also permitted to challenge the DNA evidence against him in several ways, including through his own expert and cross-examination of the prosecution's experts. He was able to highlight the fact that many of the DNA samples tested excluded him as a donor and that there were inconsistent conclusions between the two uses of the TrueAllele software. To the extent his right to cross-examination was limited, it was not heavily limited with respect to the DNA evidence and not limited at all with respect to the most important witnesses in the case, the victims and the police criminologists gathering non-DNA evidence. Accordingly, we conclude any error in failing to require production of the TrueAllele source code was harmless beyond a reasonable doubt.

Johnson, 2019 WL 3025299, at *8–11.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted) (quoting California v.

---

[8] We note, too, that the manual interpretation of DNA found on the roadway zip tie was sufficient to provide a CODIS hit with appellant's known sample and clear enough that appellant's own DNA expert admitted appellant's DNA was on the item. These DNA findings are not related to the disputes raised with respect to the TrueAllele program's probabilistic analysis of multi-source low-level DNA and further buttresses the prosecution's otherwise convincing circumstantial case.

1    Trombetta, 467 U.S. 479, 485 (1984)). Violations of both the right to present a complete defense

2    and the Confrontation Clause are subject to harmless error review. Crane, 476 U.S. at 691;

3    Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). Under Chapman v. California, 386 U.S. 18

4    (1967), "the test for determining whether a constitutional error is harmless . . . is whether it

5    appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict

6    obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24).

7    "When a state court has applied Chapman, § 2254(d)(1) requires a habeas petitioner to prove that

8    the state court's decision was unreasonable. To accomplish that, a petitioner must persuade a

9    federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the

10   Supreme] Court's precedents." Brown v. Davenport, 142 S. Ct. 1510, 1525 (2022) (first

11   alteration in original) (citations omitted). That is, "AEDPA asks whether *every* fairminded jurist

12   would agree that an error was prejudicial[.]" Davenport, 142 S. Ct. at 1525.

13          Whether a Confrontation Clause error "is harmless in a particular case depends upon a

14   host of factors," including "[1] the importance of the witness' testimony in the prosecution's

15   case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence

16   corroborating or contradicting the testimony of the witness on material points, [4] the extent of

17   cross-examination otherwise permitted, and, of course, [5] the overall strength of the

18   prosecution's case." Van Arsdall, 475 U.S. at 684. Here, the California Court of Appeal found

19   any error to be harmless because the evidence at trial, excluding the challenged DNA evidence,

20   "built a strong circumstantial case" and the court "readily conclude[d] the evidence

21   overwhelmingly confirms [Petitioner]'s guilt." Johnson, 2019 WL 3025299, at *10. "[T]he state

22   court did not, and need not, analyze the five Van Arsdall factors." Gonzales v. Stainer, 507 F.

23   App'x 704, 705–06 (9th Cir. 2013) (citing Early v. Packer, 537 U.S. 3, 8 (2002)).

24          With respect to the first factor, importance of the challenged DNA evidence in the

25   prosecution's case, the Court looks to the prosecution's closing argument. See Gautt v. Lewis,

26   489 F.3d 993, 1013 (9th Cir. 2007) ("The purpose behind a closing argument is 'to explain to the

27   jury what it has to decide and what evidence is relevant to its decision.' The government's

28   closing argument is that moment in the trial when a prosecutor is compelled to reveal her own

understanding of the case as part of her effort to guide the jury's comprehension." (quoting Sandoval v. Calderon, 241 F.3d 765, 776 (9th Cir. 2000))). The prosecutor's closing argument began with playback of the victims' voices. (33 RT[9] 5751–52.) Immediately thereafter, the prosecutor stated:

> [She] acted with incredible courage. . . . Her 911 call on that pink Disney princess telephone caused the defendant to run away, back out into the night, but in his haste he dropped something, and it was his undoing. He dropped two 11-inch zip ties, hooked together once, and this was to be his undoing, because this had his DNA on it, and enough of it for an upload into CODIS, and the forensic evidence has exposed him.
>
> A basic principle involved in forensic science is the perpetrator of a crime will bring something into a crime scene and leave it there. That held true in this case. Wherever he steps, whatever he touches, whatever he leaves, even unconsciously, will serve as a silent witness against him. This is evidence that does not forget. It is not confused by the excitement of the moment. It is not absent, because human witnesses are. It is factual evidence.
>
> Physical evidence cannot perjure itself. Only human failure to find it, study it, and understand it can diminish its value. This is a quote from a forensic scientist from 62 years ago.
>
> And the world of nine women and children from east Bakersfield, California, came together with the world of forensic scientists here in Bakersfield and in Pittsburgh, Pennsylvania, and these DNA experts have enabled the light of truth to shine on the defendant. The evidence in this case has shown that Billy Ray Johnson is the person who committed these acts of sexual depravity upon all of these victims and it is now time to see that justice is served.

(33 RT 5752–53.) The prosecutor's first mention of evidence during closing argument referred to DNA. The prosecutor also distinguished and elevated the DNA evidence from other evidence because it "does not forget," "is not confused by the excitement of the moment," "is not absent," and "cannot perjure itself." (33 RT 5752.) This supports a conclusion that the challenged DNA evidence was important to the prosecution's case. Accordingly, the first factor weighs against a finding of harmless error.

With respect to the second factor, the challenged DNA evidence was not cumulative of other evidence, and thus, weighs against a finding of harmless error. With respect to the third

---

[9] "RT" refers to the Reporter's Transcript of Testimony and Proceedings lodged by Respondent on October 21, 2021. (ECF No. 14.)

1  factor, the presence of absence of evidence corroborating or contradicting the testimony of the

2  witness on material points, the manual analysis of the various DNA samples generally did not

3  result in a match to Petitioner. See Johnson, 2019 WL 3025299, at *3–6. However, utilizing both

4  manual interpretation and the TrueAllele software, all the experts agreed that Petitioner's DNA

5  was on the roadway zip tie. See Johnson, 2019 WL 3025299, at *5–6. Accordingly, the third

6  factor is neutral or weighs slightly against a finding of harmless error. With respect to the fourth

7  factor, the extent of cross-examination permitted, although the defense was not given access to

8  the TrueAllele program source code, defense counsel was able to extensively cross-examine the

9  prosecution's expert witnesses. Thus, the fourth factor weighs in favor of a finding of harmless

10  error.

11         With respect to the fifth factor, the overall strength of the prosecution's case, as set forth

12  above, the California Court of Appeal listed a panoply of evidence that supported Petitioner's

13  convictions without the challenged DNA evidence, including: Petitioner having multiple pairs of

14  shoes that both matched the description provided by witnesses and/or could not be ruled out as

15  causing the three different shoe prints at three different crime scenes; in three of the four

16  incidents, Petitioner was using his phone before and after, but not during the attack, in locations

17  that utilized cell towers covering the crime scenes; in the remaining incident, Petitioner was

18  using his phone in a location that utilized a cell tower covering the crime scene and it was the

19  only time Petitioner's phone was in that area over a several month period; Petitioner having

20  access to cash immediately after one of the robberies; Petitioner's statements to law enforcement

21  suggesting guilt and his admissions to other robberies; Petitioner's search history for information

22  on the incidents and his cell phone videos demonstrating sexually driven prowling behaviors;

23  and Petitioner's possession of clothing and tools (e.g., zip ties) similar to those used in the

24  incidents. Accordingly, the fifth factor weighs in favor of a finding of harmless error.

25         "The term 'unreasonable' [in § 2254(d)] refers not to 'ordinary error' or even to

26  circumstances where the petitioner offers 'a strong case for relief,' but rather to 'extreme

27  malfunctions in the state criminal justice syste[m].'" Mays v. Hines, 141 S. Ct. 1145, 1149

28  (2021) (per curiam) (some internal quotation marks omitted) (second alteration in original)

(quoting <u>Richter</u>, 562 U.S. at 102). Petitioner has not established that no fairminded jurist could reach the state court's conclusion under Supreme Court precedent. <u>See</u> <u>Davenport</u>, 142 S. Ct. at 1525. Therefore, the Court finds that the state court's harmless error determination regarding the trial court's denial of Petitioner's request to access the TrueAllele source code was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

### B.  Exclusion of Expert Testimony

In his second claim for relief, Petitioner asserts that the trial court's exclusion of Petitioner's expert testimony regarding the assumptions made about the sample material input into the TrueAllele program violated his rights to confrontation, compulsory process, and due process. (ECF No. 8 at 4, 23–27.) Respondent argues that rejecting Petitioner's DNA challenges was reasonable. (ECF No. 16 at 8.) This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LD 82.) As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal, Fifth Appellate District.

In denying Petitioner's exclusion of expert testimony claim, the California Court of Appeal stated:

> In a partially-related argument, appellant objects to the trial court's exclusion of certain expert evidence he proffered regarding the way certain assumptions entered into the TrueAllele software affect the results generated. Specifically, appellant contends the trial court incorrectly concluded that appellant's expert, Suzanna Ryan, was not qualified to testify about how assumptions made when setting up the TrueAllele software affected the mathematical formula and, subsequently, the results of the tests because Ryan had not been formally trained on the software, or previously used it. Appellant contends these facts go to the weight, and not the admissibility of Ryan's testimony, that she was otherwise qualified, and that excluding her testimony was an abuse of discretion. He further

contends that the DNA evidence was essential to this case and, thus, the error requires reversal.

***Standard of Review and Applicable Law***

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) Generally, any error excluding portions of a defense is one of state law where we apply the *Watson* standard and ask whether it was reasonably probable that a defendant would have obtained a more favorable result, although certain constitutional errors—such as the complete exclusion of a defense—may be reviewed under the *Chapman* standard, asking whether any error was harmless beyond a reasonable doubt. (See *People v. Jones* (2012) 54 Cal.4th 1, 68.)

***Any Error Was Harmless***

Appellant's arguments focus on the trial court's decision to exclude a portion of his defense, in the form of testimony regarding the effect of certain choices upon the results generated by the TrueAllele software. While appellant claims that this exclusion prevented him from presenting any defense about the reliability of the DNA results generated by the TrueAllele software program, we need not resolve whether his assertions reach the level of constitutional error warranting *Chapman* review. This is so because any alleged error is harmless beyond a reasonable doubt. As discussed in the previous section, the People presented a strong case derived from numerous pieces of circumstantial evidence that did not require the use of DNA evidence, where the evidence of guilt was simply overwhelming. Although the People worked to buttress their case with DNA results, those results were not as strong as the circumstantial evidence and not necessary for conviction. Indeed, the results of tests from the two labs involved conflicted in several instances, one lab found evidence inconclusive or exclusionary while the other found it inculpatory. These differences were admitted at trial and used as a part of the defense. In this context, the court's decision to limit appellant's expert testimony based on the expert's failure to have previously used or been trained on the TrueAllele program was not significant to the case. Appellant had already placed the DNA results in question and, more importantly, the overwhelming circumstantial evidence presented regarding his participation in these attacks rendered exclusion of any additional attacks on that DNA evidence harmless beyond a reasonable doubt.

Johnson, 2019 WL 3025299, at *11.

Although inclusion of the defense expert's testimony regarding the effect of certain choices upon the results generated by the TrueAllele software would have allowed the defense to further attack the credibility and reliability of the DNA results generated by the software, defense counsel extensively cross-examined Perlin and Sugimoto and repeatedly emphasized to the jury the differing and sometimes conflicting results obtained from the two experts using the same software. Furthermore, as set forth in section IV(B), *supra*, there was a panoply of other

1  evidence that supported Petitioner's convictions such that Petitioner has not established that no

2  fairminded jurist could reach the state court's harmless error conclusion.

3       Based on the foregoing, the Court finds that the state court's harmless error determination

4  regarding the trial court's exclusion of the defense expert's testimony regarding the effect of

5  certain choices upon the results generated by the TrueAllele software was not contrary to, or an

6  unreasonable application of, clearly established federal law, nor was it based on an unreasonable

7  determination of fact. The decision was not "so lacking in justification that there was an error

8  well understood and comprehended in existing law beyond any possibility of fairminded

9  disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief

10  on his second claim, and it should be denied.

11      **C. Discharge of Juror**

12       In his third claim for relief, Petitioner asserts that the trial court's failure to grant a

13  mistrial after discharge of a juror violated his statutory and Fifth and Sixth Amendment rights.

14  (ECF No. 8 at 5, 27–28.) Respondent argues that rejecting a mistrial claim was reasonable. (ECF

15  No. 16 at 12–13.) This claim was raised on direct appeal in the California Court of Appeal, Fifth

16  Appellate District, which denied the claim in a reasoned decision. The claim was also raised in

17  the petition for review, which the California Supreme Court summarily denied. (LD 82.) As

18  federal courts "look through" summary denials and review "the last related state-court decision

19  that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192, this Court will examine the

20  decision of the California Court of Appeal, Fifth Appellate District.

21       In denying Petitioner's mistrial claim, the California Court of Appeal stated:

22       Appellant first contends the court incorrectly failed to order a mistrial when it
23       dismissed one of the original 12 sworn jurors before alternates were selected. We
     find any error harmless.

24       ***Standard of Review and Applicable Law***

25       Code of Civil Procedure section 233 governs the discharge of jurors unable to
26       perform their duties and applies to the situation in this case. It provides detailed
     instructions when a jury is dismissed, as follows:

27          "If, before the jury has returned its verdict to the court, a juror ..., upon
        other good cause shown to the court, is found to be unable to perform his
28          or her duty, the court may order the juror to be discharged. If any alternate

jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged. If after all alternate jurors have been made regular jurors or if there is no alternate juror, a juror becomes ... unable to perform the juror's duty and has been discharged by the court as provided in this section, the jury shall be discharged and a new jury then or afterwards impaneled, and the cause may again be tried. Alternatively, with the consent of all parties, the trial may proceed with only the remaining jurors, or another juror may be sworn and the trial begin anew."

The parties dispute how we should review any error arising under this law.

***Harmless Error Analysis Applies and Any Error Was Harmless***

Appellant argues that the specific language of Code of Civil Procedure section 233 demonstrates that the court erroneously failed to grant a mistrial upon removing one of the 12 sworn jurors prior to selecting alternates to replace him. Appellant claims such an error is structural in nature and, therefore, reversible per se. The People concede that, under "the plain language of Code of Civil Procedure section 233, the trial court should have discharged the jury after it dismissed the sworn juror, because there was no alternate juror and the defense did not consent to proceed with 11 jurors for the remainder of jury selection," but argue we should interpret the statute to avoid such an absurdity and that any error was harmless.

We take no position on whether the statute's plain language requires restarting jury selection if a sworn juror is dismissed in the period between swearing in the original 12 jurors and selecting and swearing in the alternates. We do not agree, however, that any error in this instance is structural and reversible per se. Rather, if any error occurred, it was a violation of state law jury selection statutes.

As the People note, appellant's right to proceed with a particular jury attaches once the jury is sworn and double jeopardy attaches. (See *People v. Whitaker* (2013) 213 Cal.App.4th 999, 1011.) However, double jeopardy does not attach until after the alternate jurors are selected and sworn in. (See *People v. Griffin* (2004) 33 Cal.4th 536, 565–566, disapproved on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) The trial court's decision to select alternate jurors after dismissing one of the sworn jurors thus did not impair appellant's fundamental right to a jury trial or otherwise permit him to be convicted by a jury of less than 12 of his peers. Accordingly, any error is subject to state law harmless error analysis. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836; see also *People v. Rambaud* (1926) 78 Cal.App. 685, 692 ["The order of selecting a juror is a matter of procedure and ... the state constitution specifies that no error as to any matter of procedure shall be held sufficient to set aside a verdict or order a new trial, unless it appears from the record that the error complained of has caused a miscarriage of justice."].)

Under this standard, we conclude the error was harmless. Procedurally, appellant was aware that alternate jurors would be selected for his trial. And appellant eventually selected alternate jurors knowing that one of them would be placed on his jury panel due to the dismissal. While appellant raises a concern that his ability to select a jury based on his understanding of how all 12 jurors will interact was impaired, we do not see this as prejudicial error under the circumstances. Indeed, appellant was required to select alternate jurors even if no prior juror had been dismissed and, if the dismissal issue had not arisen until after swearing in the

1
2
3
4
5
6
7

> alternates, appellant would have been in at least the same, if not a worse, position given that one of the alternates would have been properly placed on the jury upon dismissal of the original juror and appellant would not have been able to screen the alternates based on the knowledge one would definitively be included in the deliberations. Ultimately, appellant proceeded to trial with 12 jurors and the remaining alternates, and with knowledge that any selected alternate could be added to the original jury panel. Other than the knowledge that one alternate would definitively be added to the jury, this process was no different than intended under the law. We further see the error as harmless substantively. For all the reasons previously discussed, we see no possibility that this change in the jury's makeup affected the outcome of this case. Accordingly, any error was harmless.

8   Johnson, 2019 WL 3025299, at *11–13.

9        "The Sixth Amendment guarantees a criminal defendant the right to a 'fair trial by a

10   panel of impartial, indifferent jurors.'" Bell v. Uribe, 748 F.3d 857, 868–69 (9th Cir. 2014)

11   (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). "[A] defendant is only entitled to a jury

12   composed of 'jurors who will conscientiously apply the law and find the facts,' and that is

13   'capable and willing to decide the case solely on the evidence before it.'" Bell, 748 F.3d at 869

14   (first quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984); then

15   quoting Lockhart v. McCree, 476 U.S. 162, 178 (1986)). Although the trial court may have failed

16   to comply with California jury selection statutes when it dismissed one of the original twelve

17   sworn jurors before alternates were selected, Petitioner does not establish that any member of the

18   final jury panel was not impartial or unable to conscientiously apply the law and find the facts

19   solely based on the evidence before them. If any error occurred, it was an issue of state law, and

20   "federal habeas corpus relief does not lie for errors of state law." Swarthout v. Cooke, 562 U.S.

21   216, 219 (2011) (per curiam).

22        Based on the foregoing, the Court finds that the state court's denial of the mistrial claim

23   was not contrary to, or an unreasonable application of, clearly established federal law, nor was it

24   based on an unreasonable determination of fact. The decision was not "so lacking in justification

25   that there was an error well understood and comprehended in existing law beyond any possibility

26   of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

27   habeas relief on his third claim, and it should be denied.

28   ///

### D. **Batson/Wheeler**

In his fourth claim for relief, Petitioner asserts that the trial court erred in denying his

Batson/Wheeler motion. (ECF No. 8 at 5, 29–32.) Respondent argues that the state court's

rejection of this claim was reasonable. (ECF No. 16 at 13–15.) This claim was raised on direct

appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a

reasoned decision. The claim also was raised in Petitioner's petition for review in the California

Supreme Court, which summarily denied the petition. As federal courts review the last reasoned

state court opinion, the Court will "look through" the summary denial and examine the decision

of the California Court of Appeal. See Wilson, 138 S. Ct. at 1192.

In denying the Batson/Wheeler claim, the California Court of Appeal stated:

> Appellant's second procedurally-based concern arises from how the trial court
> managed his *Batson/Wheeler* objections during the jury selection process.

> ***Standard of Review and Applicable Law***

> The use of peremptory challenges to remove prospective jurors on the sole ground
> of group bias violates both the California and United States Constitutions.
> (*Batson*, *supra*, 476 U.S. at p. 89 [right to equal protection]; see *Wheeler*, *supra*,
> 22 Cal.3d at pp. 276–277 [right to trial by jury drawn from representative cross-
> section of the community]; see also *People v. Burgener* (2003) 29 Cal.4th 833,
> 863.) "A party who suspects improper use of peremptory challenges must raise a
> timely objection and make a prima facie showing that one or more jurors [have]
> been excluded on the basis of group or racial identity." (*People v. Jenkins*, *supra*,
> 22 Cal.4th at p. 993.) "Once a prima facie showing has been made, the prosecutor
> then must carry the burden of showing that he or she had genuine
> nondiscriminatory reasons for the challenges at issue." (*Ibid.*) At that point, the
> trial court must decide whether the opponent of the challenge has proved
> purposeful discrimination. (*People v. McDermott* (2002) 28 Cal.4th 946, 971.)

> This next part of the *Batson/Wheeler* analysis "focuses on the subjective
> genuineness of the reason, not the objective reasonableness." (*People v. Gutierrez*
> (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).) It is, in essence, a credibility
> determination in which "the court may consider, ' "among other factors, the
> prosecutor's demeanor; ... how reasonable, or how improbable, the explanations
> are; and ... whether the proffered rationale has some basis in accepted trial
> strategy." ' " (*Ibid.*) "To satisfy herself that an explanation is genuine, the
> presiding judge must make 'a sincere and reasoned attempt' to evaluate the
> prosecutor's justification, with consideration of the circumstances of the case
> known at that time, her knowledge of trial techniques, and her observations of the
> prosecutor's examination of panelists and exercise of for-cause and peremptory
> challenges." (*Id.* at p. 1159.)

> In carrying out this obligation, the trial court is not required to make specific or
> detailed comments for the record to justify every instance where it finds a
> prosecutor's nondiscriminatory reason for exercising a peremptory challenge as

genuine. This is particularly true where the prosecutor bases his or her nondiscriminatory reason for exercising a peremptory challenge on the prospective juror's demeanor, or similar intangible factors, while in the courtroom. (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) In contrast, " 'when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' " (*Gutierrez, supra,* 2 Cal.5th at p. 1171.) Ultimately, while the "movant must show it was ' "more likely than not that the challenge was improperly motivated" ' " (*id.* at p. 1158), "the ultimate responsibility of safeguarding the integrity of jury selection and our justice system rests with courts" (*id.* at p. 1175).

We generally review the trial court's ruling on this issue for substantial evidence and with great restraint. (*People v. McDermott, supra,* 28 Cal.4th at p. 971.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*People v. Burgener, supra,* 29 Cal.4th at p. 864.) However, when assessing "the viability of neutral reasons advanced to justify a peremptory challenge by a prosecutor, both a trial court and reviewing court must examine only those reasons actually expressed." (*Gutierrez, supra,* 2 Cal.5th at p. 1167.) "What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual." (*Id.* at p. 1159.)

"Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude' " that "requires reversal of [appellant's] resulting convictions." (*Gutierrez, supra,* 2 Cal.5th at p. 1172.)

### *The Court Did Not Err By Failing to Obtain Explanations for All Prior Strikes*

Appellant raises a narrow issue with respect to how the trial court handled his *Batson/Wheeler* motions. Specifically, appellant contends the trial court should have made the prosecutor provide a gender-neutral explanation for each woman dismissed from the venire. Appellant argues this was required because his objection covered all women dismissed and the trial court found a prima facie case with respect to L.W.

Appellant's argument rests on his interpretation of *People v. Avila* (2006) 38 Cal.4th 491. In *Avila,* our Supreme Court held that a *Batson/Wheeler* motion made to a specific prospective juror does not trigger an obligation on the trial court to review all similar previously struck prospective jurors, even if a prima facie case is made as to the current objection that utilizes past strikes for support. (*Avila,* 38 Cal.4th at p. 552.) The court further noted that although the trial court had no specific duty to review prior strikes, "upon request it may appropriately do so when the prosecutor's subsequent challenge to a juror of a protected class casts the prosecutor's earlier challenges of the jurors of that same protected class in a new light, such that it gives rise to a prima facie showing of group bias as to those earlier jurors." (*Ibid.*) Appellant contends his renewed objection as to all previous women struck triggered an obligation for the trial court to conduct a holistic review. The People oppose this contention, arguing appellant's renewed objection did not place the People's prior actions in a new light and, thus, the trial court was correct not to go any further than the current objection to L.W.

We agree with the People in this instance. *Avila* does not mandate that the trial court review all prior strikes upon a probable cause finding with respect to one prospective juror, even if an objection is made as to all strikes after probable cause is found as to one. Rather, *Avila* leaves such an inquiry within the trial court's discretion for those times it deems appropriate because the later objection places all prior objections in a new light.

In this instance, the court found a prima facie case based on the number of challenges made to women and its "recollection of the earlier and current responses by [L.W]." The People then explained its gender-neutral reasons for excluding L.W., including concerns about her mental state supported by answers and behaviors observed in court, and explained that the high number of objections to women was, in part, because there were many more women in the venire than men. The court concluded the People's arguments were sufficient and denied the motion with respect to L.W. At that point, it had heard a previous gender-neutral explanation for K.G., a gender-neutral explanation for L.W., and a viable explanation for why more women had been subject to objections. It also had a panel where several women were still serving such that, at the conclusion of the selection process, there were seven women on the jury.

Based on these facts, we see no error in the trial court's decision not to review all prior strikes to women. Resolution of the latest objection uncovered no gender-based concerns, and the panel was not being deprived of women based on the objections made. The court could properly conclude the prima facie case found with respect to L.W. was not sufficient to place all prior objections in a new light.

Johnson, 2019 WL 3025299, at *13–15.

Constitutional review of allegedly discriminatory peremptory challenges to prospective jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986). In Batson, the Supreme Court set forth a three-step process for trial courts to follow to determine whether a peremptory challenge has been exercised on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment. Ayala, 576 U.S. at 270 (citing Snyder v. Louisiana, 552 U.S. 472, 476–77 (2008)). Batson also applies to gender discrimination. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129 (1994); Flowers v. Mississippi, 139 S. Ct. 2228, 2243 (2019).

First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of [gender]. 476 U.S., at 96–97, 106 S.Ct. 1712. Second, if the showing is made, the burden shifts to the prosecutor to present a [gender]-neutral explanation for striking the juror in question. *Id.*, at 97–98, 106 S.Ct. 1712. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. *Purkett v. Elem*, 514 U.S. 765, 767–768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per*

1
2
*curiam*). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson, supra*, at 98, 106 S.Ct. 1712. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion
3

4
regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett, supra*, at 768, 115 S.Ct. 1769.
5

6
<u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006) (third alteration in original).

7
Here, Petitioner asserts that the "trial court committed reversible error by failing to

8
require that the prosecution provide an explanation for the challenges of prospective jurors K.W.,

9
K.C., K.B., and G.F. and J.W.," arguing that the trial court "fail[ed] to follow the second step of

10
the Batson process." (ECF No. 8 at 31–32.) Respondent argues that there is at least a reasonable

11
argument that no prior Supreme Court case has held that upon finding a *prima facie* case for later

12
striking a woman, reasons are needed for prior striking of women; and regardless, the state

13
appellate court held the trial court only found a *prima facie* case with respect to one prospective

14
juror, "which leaves nothing to discuss." (ECF No. 16 at 14–15.)

15
As set forth in section II, *supra*, defense counsel's first <u>Batson</u> objection was made when

16
the prosecution struck a sixth prospective female juror, K.G. The trial court overruled this

17
objection, finding no *prima facie* showing had been made. When the prosecutor thereafter

18
challenged female prospective juror L.W., defense counsel again objected, stating:

19
20
21
22
23
Your Honor, the defense is forced to renew its Batson-Wheeler motion, it's now seven out of nine females that have been dismissed by the People, and the defense relies upon the sheer number, seven out of nine, to show a prima-facie case that the People must now explain all their female decision — "female decisions" is the wrong term, but all their thinking as to gender-neutral as to all seven. Defense feels a full Batson-Wheeler hearing must be held.

24
(10 ART[10] 1860–61.) In response, the prosecutor merely stated that "a prima facie case of

25
systematic exclusion based on gender has not been established." (<u>Id</u>.) The trial court then ruled:

26
"Out of an abundance of caution, I think that in my recollection of the earlier and current

27

28
[10] "ART" refers to the Augmented Reporter's Transcript of Testimony and Proceedings lodged by Respondent on October 25, 2021. (ECF No. 15.)

responses by [L.W.], find that a prima facie case has been shown." (Id.) The prosecutor provided

an explanation for striking L.W. After the explanation was provided, defense counsel stated:

> Now that a prima facie case has been shown to [L.W.], I now
> believe that the defense is entitled to hear the gender-neutral
> explanations on all the females, because the Batson-Wheeler is not
> based just on [L.W.] or [K.G.]. It's based on what the defense
> believes is a systematic exclusion of females as shown by the tally
> of seven out of nine.

(10 ART 1869.) The prosecutor responded that the state case cited by defense counsel "doesn't

sound to me like the new case changes the law. . . . I'm not hearing any more as far as the change

in the law that each of the challenges has to be justified, and that I do not believe is the current

state of the law." (10 ART 1869–70.) The trial court then ruled that "[b]ased on [L.W.]'s

responses today and when she initially came in, and based upon the totality of the circumstances

and the arguments of counsel, I find that group-neutral, genuine non-discriminatory purpose was

used in excusing [L.W.]. Respectfully deny the Batson-Wheeler challenge." (10 ART 1870.)

The Court finds Williams v. Carey, No. C 05-2870 MHP (PR), 2007 WL 3105068 (N.D.

Cal. Oct. 23, 2007), to be instructive.

> Williams assert[ed] an interesting procedural claim about *Batson v.*
> *Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1988). He
> contend[ed] that, although the trial court denied his first objection
> to the peremptory strike of one juror for lack of a prima facie
> showing, the trial court was obliged to reconsider the striking of
> that juror when Williams later objected to the peremptory strike of
> a second juror as to which the court found that a prima facie case
> had been shown but, after hearing the prosecutor's explanation,
> determined that no discriminatory purpose existed for striking the
> second juror.

Id. at *12. The district court denied relief, holding:

> There also is no Supreme Court authority that requires that, where
> *Batson* motions are made seriatim, the trial court must consider
> anew a peremptory challenge it has already found had satisfied
> *Batson.* And there is no Supreme Court authority that the *Batson*
> analysis must be made of the group members en masse. Given this,
> the state appellate court's rejection of Williams' claim cannot be
> said to be contrary to or an unreasonable application of, clearly
> established Supreme Court authority, as it must be to justify habeas
> relief under § 2254(d).

Id. at *13. On appeal, the Ninth Circuit affirmed the district court, holding that "Williams's

1  procedural claim regarding sequential *Batson* challenges has not yet been squarely addressed by

2  the United States Supreme Court, so we must defer to the state court's resolution of the issue."

3  Williams v. Haviland, 394 F. App'x 397, 398 (9th Cir. 2010) ("*Batson*'s general requirement that

4  the trial court assess 'all relevant circumstances' in deciding whether a defendant has made a

5  prima facie case for discrimination does not 'squarely address' the specific question whether a

6  court must reconsider its denial of a *Batson* motion with regard to one juror if it subsequently

7  finds a prima facie case of discrimination with regard to a different juror.").

8       Based on the foregoing, the Court finds that it was not objectively unreasonable for the

9  state appellate court to find that the trial court concluded the defense had established a *prima*

10  *facie* case only as to one juror, L.W., and thus, was not required to review all previously struck

11  female prospective jurors. As fairminded jurists could disagree whether the state court's decision

12  conflicts with the Supreme Court's precedents, the Court must defer to the state court's decision.

13  Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be

14  denied.

15  **V.**

16  **RECOMMENDATION**

17       Accordingly, the undersigned HEREBY RECOMMENDS that the first amended petition

18  for writ of habeas corpus be DENIED.

19       This Findings and Recommendation is submitted to the assigned United States District

20  Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

21  Rules of Practice for the United States District Court, Eastern District of California. Within

22  **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

23  written objections with the court and serve a copy on all parties. Such a document should be

24  captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

25  objections shall be served and filed within fourteen (14) days after service of the objections. The

26  assigned United States District Court Judge will then review the Magistrate Judge's ruling

27  pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within

28  the specified time may waive the right to appeal the District Court's order. Wilkerson v.

1 | Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th
2 | Cir. 1991)).
3
4 | IT IS SO ORDERED.
5 |     Dated:    **August 17, 2022**                    /s/ Erica P. Grosjean
6 |                                              UNITED STATES MAGISTRATE JUDGE
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28